35 U.S. 133 (____)
10 Pet. 133
*SARAH BOONE AND OTHERS, APPELLANTS,
v.
WILLIAM CHILES AND OTHERS, APPELLEES.
Supreme Court of United States.

*140 The case was argued at January term 1835, by Mr. Clay for the appellants, and by Mr. Harding, for the appellees.
*150 Mr. Justice BALDWIN delivered the opinion of the court.
*200] *Reuben Searcy was entitled, in virtue of the law of Virginia of May 1779, as an actual settler, to four hundred acres of land in right of settlement, and a pre-emption of one thousand acres adjoining; one-half whereof he gave to John Martin for location and patenting; and by bond, dated 24th September, 1781, bound himself to convey seven hundred acres thereof to William Hoy, "as soon as deeds are made to lands in this country in general." Hoy was to have the first choice of the lands  he bought Martin's share. On the 15th December, 1781, Hoy, by an endorsement on the bond, assigned it to George Boone, his heirs and assigns; obliging himself "as surety to the within bond, and if the within lands cannot be obtained, by reason of a prior claim, then, and in that case, seven hundred acres, equal in quality and convenience, shall discharge the within bond." On the 30th April, 1783, George Boone, by another assignment on the bond, assigned his right to Thomas Boone, his heirs or assigns, without recourse, if Hoy or his heirs are sufficient to make good the bond; if not, George Boone bound himself and heirs to make it good to Thomas Boone, his heirs and assigns.
William Hoy obtained a patent in his own name, in 1785, for the whole tract; containing, by actual survey, about two thousand acres. Thomas Boone was in Kentucky in 1802, 1810, and 1819, in the neighbourhood of the land, but never took possession of any part, or instituted any suit to recover them; he resided and died in Pennsylvania. In 1823 he filed a bill in the circuit court of Kentucky, against William Chiles, Hezekiah Boone, George Boone, Nicholas Smith, Jr., Nicholas Smith, Sen., Jacob Smeltzer, George H. Baylor, Joseph Smith, John Evalt, and Joseph Cummins, praying for a conveyance of the legal title, and account of rents and profits; and such other and further relief as his case may require. After his death, in December 1817, the bill was duly revived by his heirs. By an amended bill the heirs of John South were made defendants, in 1824. By another amended bill, the heirs of William Hoy were likewise made defendants, in 1827. In 1832 the plaintiffs, by an amendment to their bill, averred that Reuben Searcy was dead, intestate, and without heirs in Kentucky; and made the heirs of George Boone parties.
The several answers of the defendants present distinct cases *201] *for our consideration; each depending on its own circumstances, requires a separate view and examination: that of William Chiles will be first considered. The general ground of relief set forth by the plaintiffs, against all the defendants, is founded on the assignments of Searcy's bond to Thomas Boone, as conveying the equitable title to the seven hundred acres, of which Hoy held the *151 legal title; on this the general equity of the bill depended, which the plaintiffs made out. In the original bill, it was charged against William Chiles, that Thomas Boone, by the bond and assignments, had a clear equity to the one-half of the land patented to Hoy, (but was content to hold the parcels decreed to Chiles, as afterwards explained,) of which the plaintiff had never been divested. That in 1802 he had made an assurance, that he would convey to Hezekiah Boone, provided he would pay him in four years, seven hundred pounds; but the purchase was declined; no money paid, and the arrangement given up. That in 1818, Chiles and the other defendants, in their own and complainant's name, filed a bill in the Bourbon circuit court of Kentucky, against the heirs of Hoy; charging that plaintiff sold the land to Hezekiah Boone, and he to Chiles, and that all the plaintiffs in that suit desired the heirs of Hoy to convey the legal title which was prayed for by the bill; that Chiles obtained a decree for a conveyance, and a deed from a commissioner appointed by the court, to himself, of the interest of Hoy's heirs; Chiles having full notice of Thomas Boone's title, and that the contract with Hezekiah Boone had not been complied with. The bill also charges, that the Bourbon suit was fraudulently instituted, and prosecuted without the knowledge of Thomas Boone; that he never consented that the deed should be made to Chiles, who had no just claim to the land, but had engaged to maintain Smeltzer, Smiths, Evalt, Cummins, and Baylor in the possession of it. Chiles, in his answer, admits the bond and assignment to Thomas Boone; he then sets up a sale by Thomas to Hezekiah Boone; and that on the 30th October, 1817, he, Chiles, purchased from the latter, by a written contract referred to. He admits the suit in Bourbon county was brought by himself, Thomas Boone the now complainant, George and Hezekiah Boone; on which there was a decree and conveyance made to him as charged, and refers to *the proceedings in that suit; relying on it as a bar to *[202 all claim by Thomas Boone for the purchase money. He admits full knowledge of plaintiffs' interest, coupled with the knowledge that he had parted with it; that the sale was ratified by his agent, by power of attorney, and the agent's signature to the contract of purchase; both of which are made part of his answer. He insists on the sale to Hezekiah; denies fraud in instituting the Bourbon suit; and answers its being done without plaintiffs' knowledge, by averring it was under the power of attorney, and contract with Hezekiah Boone; and pleads the record as an estoppel in bar of plaintiffs' assertions; which he denies.
He also further states, that he has purchased out and holds the interest of Hoy's heirs, as he can show by title and contracts regularly made out; and sets up the lapse of time and total dereliction of his claim, as a bar to plaintiffs' right to any land. The answer concludes by averring payment by Hezekiah to Thomas Boone, of the money due on the contract of 1802; if any balance is due, offers to pay it; but insists that plaintiff has no right to the land to which Chiles holds *152 the legal title, and has a right to hold it, on doing equity to plaintiff, if not already done.
In the amended bill against Hoy's heirs, the plaintiffs charged Chiles with having fraudulently, and with knowledge of Thomas Boone's equitable interest, obtained a conveyance of the title of three of the children of William Hoy, one of whom was Cecilia Newland and her husband.
In answer to this bill, Chiles admits the purchase from two of these children directly to himself, and that Newland and wife sold to Green Clay, who conveyed to him: he then alleges Clay to have been an innocent purchaser for a valuable consideration, without notice, till his purchase was complete, and prays protection as to this part of the land.
This presents the contest between the plaintiffs and Chiles in a double aspect: first, as to his claim generally; and next, as to his claim under Green Clay, as to the share of Mrs. Newland, which will be distinctly considered. The power of attorney from Thomas to George Boone, dated 1st October, 1787, authorized him to demand *203] and receive a deed from William Hoy, for the seven *hundred acres, to act fully for him in the premises, to appoint attorneys under him; and on receiving a title and conveyance in the name of Thomas Boone, to give a discharge of the bond and Hoy's engagement. The agreement between Thomas and Hezekiah Boone, dated 30th November, 1802, was for the conveyance of this land, for seven hundred pounds, to be paid in four years; with an option to Hezekiah, within that time, to take the land or not.
The agreement under which Chiles claims to have purchased is in the following words:
"Articles of agreement made and entered into the 30th day of October, 1817, between Hezekiah Boone, of the county of Woodford, and George Boone, of the county of the county of Shelby, of the one part, and William Chiles, of the county of Montgomery, of the other part, and all of the state of Kentucky, witnesseth, that the said Hezekiah and George has this day delivered up to the said Chiles all the papers they hold relative to the tract of land containing 700 acres, it being a part of a settlement and pre-emption granted by the commissioners to Reuben Searcy; and the said Hezekiah and George Boone further agrees that the said Chiles shall have the free use of all the said papers, for the purpose of coercing the title to said land, if any is to be had, if not to get the amount in cash; and the said Chiles, on his part, is to use diligence in getting the title or the cash for said 700 acres of land, and is hereby authorized to effect the above purpose, either by suit or by compromise, provided the compromise is not for less than three thousand dollars, as he may think the most advantageous to the parties to this article; and the said Chiles further agrees, on his part, to defray all the expenses of the above-mentioned investigation; and when the above business is finished, the said Chiles agrees, further, to pay over the one equal half of the proceeds of the above business, if in cash or bonds, and if in land, the one *153 equal half of what may be obtained, to the said Hezekiah Boone, and the other half the said Chiles keeps for himself; and the said George Boone declares himself satisfied with the above contract. For the true performance of the above, the said Chiles and Hezekiah Boone bind themselves each to the other in the *penalty of ten [*204 thousand dollars. Given under our hands and seals the date above written.
 HEZEKIAH BOONE, [seal.]
 GEORGE BOONE, [seal.]
 Attorney in fact for Thomas Boone.
 "Teste, &c. WILLIAM CHILES, [seal.]"
These are the papers referred to in Chiles' answer, on which he relies to make himself a purchaser of the equitable title of Thomas Boone; under which he obtained a decree of the Bourbon court, a deed from the commissioner of the whole legal title of Hoy's heirs, and a deed from two of them to himself.
From the evidence in the record, it appears very clearly, that Hezekiah Boone never complied with the agreement with Thomas Boone; paid no part of the purchase money; and abandoned the contract many years before the agreement with Chiles, to whom the state of the contract was explained before his agreement with Hezekiah and George Boone. As a matter of law, it is equally clear, that the power of attorney to George Boone, gave him no authority to sell the land, or to take a conveyance from the heirs of Hoy, to any other person than Thomas Boone or his heirs. Chiles admits, that when the agreement was made between him, Hezekiah and George Boone, he knew of the title of Thomas Boone; that he instituted and conducted the suit in the Bourbon court, under the power of attorney to George Boone, who signed the agreement of 1817, as the attorney in fact of Thomas: Chiles does not pretend to have ever paid or agreed to pay any thing for the land: on the contrary, the agreement shows he was to pay nothing from his own pocket, in any event, except the expenses to be incurred. It does not even purport to be a purchase, or contain one clause or word which can be construed as such. The papers are delivered up to him for the purpose of coercing the title, or getting the amount in cash; one half of which, in case of success, he is to give to Hezekiah Boone, and retain the other for his own use. Nothing is to go to Thomas. George Boone, his agent, consents to it; and Chiles procures the legal title to himself in virtue of these papers.
*Such is the case between the parties, as presented by the [*205 pleadings, exhibits, and evidence. A court of equity must be regardless of all its rules, before it can recognize Chiles as a purchaser, or as having any right whatever in the land: it must also forfeit its character, if it sanctions such a course of iniquitous fraud. We deem it wholly useless to contrast the relative equities of the plaintiffs and Chiles, in order to affirm their right to a decree for the conveyance of the legal title, obtained in violation of every principle which governs *154 courts of equity; unless he has made out some objections to the relief prayed, on grounds unconnected with the justice of the case.
It is objected that, inasmuch as the condition of Searcy's bond to Hoy was satisfied on the latter obtaining the patent, the plaintiffs can have no equity by its assignment. This would be a sufficient answer to a suit against Searcy; but is none to a suit against Hoy's heirs, to enforce the performance of the terms of the assignment from Hoy to George Boone; which were an agreement to transfer the seven hundred acres, or an equivalent in quantity and convenience. As between Hoy and Boone, and his assigns; this gave a right to call on Hoy for the legal title, which Chiles had taken to himself, when the equity was in the plaintiffs; whose equity depends, not on the bond of Searcy, but the contract of Hoy, made by the assignment of his equitable interest in the land.
This view of the case, disposes of the objection that the heirs of Searcy are not parties: they had no interest in the land; their father's bond was satisfied by the performance of the condition, when the patents were obtained by Hoy; who, by purchase from Martin and Searcy, held the legal title to the whole fourteen hundred acres, subject to be divested only by the equity of Boone, derived by this agreement to transfer the one-half. No act, therefore, remained to be performed by the heirs of Searcy; the title of Boone becomes complete, by the union of his equitable, with Hoy's legal title, without any interposition of the heirs of Searcy, who have no interest to defend or title to convey. The purchase from Martin removes another objection, arising from Hoy having the first choice of the land, and dying without having made it; whereby, as is alleged, the subject-matter *206] of the *bill was too vague to authorize a decree in favour of the plaintiffs. As Hoy held the whole tract, there was no necessity for his making the selection, it being immaterial to him which part he held under Martin or Searcy: his not making the election, and holding the whole in fraud of the rights of his assignee, could not prejudice him, to whom he had transferred as well the right of selection, as the land itself, in equity. Independently, however, of this consideration, we think that the identity of the land is ascertained by the terms of the bond and assignment, as well as the parties themselves; it was the one-half of the claim of Searcy, both by pre-emption and settlement, to be chosen by Hoy; whose assignees had the same right to choose as had been in him. Chiles, under the pretence and claim of being Hoy's assignee, made the choice by selling to the Smiths and Smeltzer, the parts of the land on which they resided: and the plaintiffs, by their original bill, agree to take their share of the land, according to the decree of the Bourbon court, in that place. This selection is, therefore binding on both parties; so that Chiles is not at liberty to contest the location, made first by his own act in the sale to the occupants, confirmed by a decree obtained at his own suit, and agreed to by the plaintiffs, as to the part to be conveyed.
It is further objected, that there is a surplus in the survey to which *155 the heirs of Boone are not entitled; if this objection could be sustained by any of the parties to this suit, it could be only by those whose rights by purchase or possession would be disturbed, by decreeing to the plaintiffs more than the seven hundred acres. As Chiles has neither any right by purchase or any equity by long possession or improvements; but claims only by the fraudulent assumption of the plaintiffs' equitable title; the land exclusively claimed by him would be the first to be appropriated to them; and any surplus would be reserved for the benefit of those who had some pretensions to an equitable interest in it.
The lapse of time and the staleness of the plaintiffs' equity, is also set up as a bar to a decree in their favour; but whatever effect time may have in equity in favour of a possession long and peaceably held, it can have none in favour of Chiles, whose only claim is under the equity of Thomas Boone, and against whom the *present suit [*207 was brought in six years after he first interfered with it. It cannot be permitted to him to acquire the legal title of Hoy, in virtue of Boone's equity, and to hold it to his own use; on the ground that Boone's right had become extinct by the lapse of time, before he acquired it. The means by which the legal title has been conveyed to Chiles, have affected his conscience too deeply with fraud, for a court of equity to suffer him to enjoy its fruits. As to him, the plaintiffs have established a right to a decree for the conveyance of whatever title he may have derived by any conveyance to himself directly, of the legal right of Hoy's heirs.
The next aspect of the case between the plaintiffs and Chiles, is presented by the interposition of Green Clay, as an innocent purchaser from Newland and wife, for a valuable consideration, without notice; under whom he claims protection.
In the amended bill, the plaintiffs charge the purchase from Newland and wife to have been made fraudulently, and with notice of their title; in answer to which Chiles states that Green Clay bought and received the title from John Newland and wife, knowing which, he made him a defendant in the Bourbon suit, charging him to be a guilty purchaser, with notice of the equity arising from the bond of Hoy; but, Clay denying notice, and not being able to prove it, Chiles bought his share, paid for it, and obtained a conveyance. He then refers to Clay's answer in the Bourbon court; and insists that Clay was an innocent purchaser for a valuable consideration, without notice till his purchase was complete.
In that suit Chiles had charged Clay not only with notice, but that he purchased from Newland and wife, binding himself to make good all the contracts of William Hoy. In his answer, Clay states, that the contract he made with Newland and wife was bona fide, in good faith, for a valuable consideration paid them without notice, or knowledge of any claim by Chiles; which he believes is founded in fraud and imposition; "as to the contract between this respondent and Newland and wife, it is committed to record, and will speak for itself; and this respondent believes the complainant Chiles has misrepresented *156 the true meaning thereof;" but does not deny the averment *208] that he was *bound to perform Hoy's contracts. The answer of Newland and wife to this part of the amended bill, states that, if they ever had any interest in the land, they have transferred their interest by a writing, amounting to a quit-claim, to Green Clay, but they never conveyed their title by deed to him or any one else. This is the substance of all the pleadings on this part of the case. In 1821, the Bourbon county court made a final decree in favour of Chiles; as well against the heirs of Hoy, as Green Clay: which was reversed by the court of appeals in 1827, for the want of proper parties, without any examination of the merits.
In March, 1825, Green Clay, by his indenture, granted to Chiles all the right, title, and interest which he holds by a deed from Newland and wife, dated 23d of May, 1814, to the tract of Searcy, and a pre-emption and settlement right of one Townsend, in consideration of two hundred and sixteen dollars, with warranty against himself and heirs, but against no other person.
The deed from Newland and wife to Green Clay was not referred to in the pleadings, made an exhibit in the cause, or so far as appears, used in the circuit court; it was no part of the record before us at the argument of this cause at the last term, and no suggestion of diminution was then made. At the May sessions of the circuit court, on a suggestion of the defendant, that this deed was on file, and had been used at the hearing, the court ordered it to be certified to this court; and the counsel for plaintiffs having agreed to consider it as returned on a certiorari: it has been read, and we have taken it into our consideration as an exhibit in the cause. In doing this, however, we must be distinctly understood, as clearly of opinion, that it is not admissible by the rules of appellate courts; who can act on no evidence which was not before the court below, or receive any paper that was not used at the hearing. 9 Pet. 731. Nor would it have been a proper subject for that court to have considered, had it been offered to make out the case of the defendant; the deed was not set up or relied on in the answer of Chiles or of Clay, which was referred to and made a part of it; the existence of such a deed was no part of their allegations. Clay asserted merely a contract; Chiles alleged only that Clay bought and received the title of Newland *209] and wife, without stating what the *title was, or how purchased; whether by deed or otherwise. There was, therefore, no allegation in the answer of either, which referred to the deed; it was not made a part of their case, which was put on a contract of purchase, and not a deed consummating it by a conveyance. A party is not allowed to state one case in a bill or answer, and make out a different one by proof: the allegata and probata must agree; the latter must support the former, 4 Mad. R. 21, 9; 3 Wh. 527; 6 Wh. 468; 2 Wh. 380; 2 Pet. 612; 11 Wh. 103; 6 J.R. 559, 63; 7 Pet. 274: and there is no one subject of equity cognisance, on which there is a wider difference between a deed and a contract of purchase, than in the one now under consideration. A purchaser *157 with notice may protect himself under a purchaser by deed without notice; but cannot do it by purchase from one who holds claims by contract only. The cases are wholly distinct. In the former, the purchaser with notice is protected; in the latter, he has no standing in equity, for an obvious reason: that the plaintiffs' elder equity shall prevail, unless the defendant can shelter himself under the legal title acquired by one whose conscience was not affected with fraud or notice, and who can impart his immunity to a guilty purchaser, as the representative of his legal rights fairly acquired by deed, in such a manner as exempts him from the jurisdiction of a court of equity. Such a purchase affixes no stain on the conscience, and equity cannot disturb the legal title. But as it does not pass by a contract of purchase without deed, the defendant can acquire only an equity, the transfer of which does not absolve him from the consequences of his first fraudulent purchase. His second purchase of an equity will not avail him more than the first, for the original notice of the plaintiffs' equity taints his conscience, so as to make him a mere trustee, if he holds the legal title from one who is not an innocent, bona fide, purchaser. If, then, Green Clay purchased only by contract from Newland and wife, they held the legal title; such was the case presented by the answer on which Chiles must stand at the hearing: but if permitted to rely on a deed; the court would render a decree on a case not before them, or one which the plaintiff would be prepared to meet. 6 J.C. 349. For these reasons we should have omitted any notice of this deed, but as it has been commented *on in [*210 the argument, and it is for the interest of all parties that the merits of the case be finally adjudicated; we have, for this purpose, considered it as evidence in the cause. It is an indenture for the consideration of one hundred dollars, granting to Green Clay, his heirs and assigns, all the right, title, claim, and interest of Newland and wife in the real and personal estate of William Hoy; all debts, dues, demands, rents, and profits, in law or equity, to which she was entitled as one of his heirs and legatees, with warranty against themselves and all claiming under them; but against no other person whatever; and with also an agreement for further assurance, but in such a way as not to make themselves liable further than to convey such title as descended to them from William Hoy.
This is the case set up in the answer, and made out by the proofs in the cause, to make out Green Clay to be such a purchaser, that his deed to Chiles will absolve the latter from the consequences of his fraudulent purchase, with full notice of the plaintiffs' equity; whether this is such a case as will give to Chiles the protection he claims, depends on the rules which courts of equity have adopted as to bona fide purchasers, for a valuable consideration, without notice.
It is a general principle in courts of equity, that, where both parties claim by an equitable title, the one who is prior in time is deemed the better in right. 7 Cr. 18; 18 J.R. 532; 7 Wh. 46: and that where the equities are equal in point of merit, the law prevails.
*158 This leads to the reason for protecting an innocent purchaser, holding the legal title, against one who has the prior equity: a court of equity can act only on the conscience of a party; if he has done nothing that taints it, no demand can attach upon it, so as to give any jurisdiction. Sugden on Vend. 722. Strong as a plaintiff's equity may be, it can in no case be stronger than that of a purchaser, who has put himself in peril by purchasing a title, and paying a valuable consideration, without notice of any defect in it, or adverse claim to it: and when, in addition, he shows a legal title from one seised and possessed of the property purchased, he has a right to demand protection and relief, 9 Ves. 30-4, which a court of equity imparts *211] liberally. Such suitors *are its most especial favourites. It will not inquire how he may have obtained a statute, mortgage, encumbrance, or even a satisfied legal term, by which he can defend himself at law, if outstanding; equity will not aid his adversary in taking from him the tabula in naufragio, if acquired before a decree. Shower, P.C. 69; 4 B.P.C. 328; 1 D. & E. 767; P.C. 65; 7 V. 576; 10 V. 268, 70; 11 V. 619; 2 Ch. Cas. 135, 6; 2 Vin. 161; 1 Vent. 198. Relief will not be granted against him in favour of the widow or orphan. P.C. 249; 2 V. Jr. 457, 8; 5 B.P.C. 292; nor shall the heir see the title-papers. 18 Vin. 115; 1 Ch. Cas. 34, 69; 2 Freem. 24, 43, 175; it is a bar to a bill to perpetuate testimony, or for discovery. 1 Harrison's Ch. 261, 3; Sugden, 723, 4; 1 Vernon, 354; and goes to the jurisdiction of the court over him; his conscience being clear, any adversary must be left to his remedy at law: 2 V. Jr. 457; 3 V. Jr. 170, 183; 9 V. 30, and 18 J.R. 532; 7 Cr. 18.
But this will not be done on mere averment or allegation; the protection of such bona fide purchase, is necessary only when the plaintiff has a prior equity; which can be barred or avoided only by the union of the legal title with an equity, arising from the payment of the money, and receiving the conveyance without notice, and a clear conscience. It is setting up matter not in the bill; a new case is presented, not responsive to the bill; but one founded on a right and title operating, if made out, to bar and avoid the plaintiffs' equity, which must otherwise prevail. 9 V. 33, 34. The answer setting it up is no evidence against the plaintiff, who is not bound to contradict or rebut it. 14 J.R. 63, 74; 1 Mumf. 396, 7; 10 J.R. 544, 8; 2 Wh. 383; 3 Wh. 527; 6 Wh. 468; 1 J.C. 461. It must be established affirmatively by the defendant, independently of his oath. 6 J.R. 559; 1 J.R. 590; 17 J.R. 367; 18 J.R. 532; 2 J.C. 87, 90; 4 B.C. 75; Amb. 589; 4 V. 404, 587; 3 J.C. 583. In setting it up by plea or answer, it must state the deed of purchase, the date, parties, and contents briefly; that the vendor was seized in fee, and in possession; the consideration must be stated, with a distinct averment that it was bona fide and truly paid, independently of the recital in the deed. Notice must be denied previous to, and down to, the time of paying the money, and the delivery of the deed; and if *159 notice is *specially charged, the denial must be of all circumstances [*212 referred to, from which notice can be inferred; and the answer or plea show how the grantor acquired title. Sugden, 766, 70; 1 Ath. 384; 3 P.W. 2801, 243, 307; Amb. 421; 2 Atk. 230; 8 Wh. 449; 12 Wh. 502; 5 Pet. 718; 7 J.C. 67. The title purchased must be apparently perfect, good at law, a vested estate in fee simple. 1 Cr. 100; 3 Cr. 133, 5; 1 Wash. C.C. 75. It must be by a regular conveyance; for the purchaser of an equitable title holds it subject to the equities upon it in the hands of the vendor, and has no better standing in a court of equity. 7 Cr. 48; 7 Pet. 271; Sugden, 722. Such is the case which must be stated to give a defendant the benefit of an answer or plea of an innocent purchase without notice; the case stated must be made out, evidence will not be permitted to be given of any other matter not set out. 7 Pet. 271.
Such are the privileges of innocent purchasers, and such the guards against those who may assume their character in courts of equity; we have only to apply their law to the answers of Chiles and Clay, together with the exhibits and proofs in the case, to ascertain whether Clay filled that character when he conveyed to Chiles, or at any other time. The answers are as barren of the averments necessary to make a case of such a purchase as would be protected against the prior equity of the plaintiffs, as the record is of the proof of any fact to support it. Nor does the consideration of the deed from Newland and wife to Clay, bring the case any nearer to the established rules and principles of equity.
Though, in form, a grant by indenture, it is, in effect, a mere release and quit-claim, as stated by Newland and wife in their answer; it does not purport or profess to convey the land in controversy; nor does it assert any title to, or seisin of it; the consideration expressed does not apply to this land, more than to a legacy or personal property. The grant is definite only in one respect, that it is of whatever descended to the grantors from William Hoy, but does not specify what it was; and the words of the grant are fully satisfied, if any thing so descended, whether realty or personalty. As to this land, Hoy was a trustee by his own contract; nothing did or could descend to his heirs, but the dry, barren, *legal title, without a shadow [*213 of beneficial interest; which was all that Newland and wife intended to convey, or Clay to receive by the deed. The covenants of warranty, and for further assurance, are expressly limited to their right, such as it was, and to their own acts only: they gave no covenant against the acts of Hoy: and by conveying only such interest as they held by descent, it passed to Clay with the same encumbrances of Boone's equity, as if it had remained in Newland and wife; who neither in their answer or by their deed, pretend to any title or right. These circumstances make the deed suspicious on its face; and in the absence of affirmative proof to support the recital of the payment of the consideration, of any evidence of seisin, or even a claim of title by the grantors, rather weakens than sustains the answer. When we find the distinct admission, and full proof of the prior equity of *160 the plaintiffs, with full notice to Chiles, who claimed, not as a purchaser, but by a special contract with Hezekiah Boone, for the division between themselves, of whatever, either of land or money, they could recover in right of Thomas Boone's known equity, and with the plain intent to defraud him; the purchase from Clay, and the setting him up as innocent purchaser for a valuable consideration without notice, under all the circumstances of this case, so far from purging the conscience of Chiles of its original taint, or imparting to him any protection as the representative of Green Clay, stamps the conduct of both with bad faith. Chiles appears on this record, a mere pretender to a purchase; by his agreement with Hezekiah Boone and George Boone, as the attorney in fact of Thomas Boone, he purchased the title of neither; his only claim under it was to the one-half of whatever he could acquire. He did not, therefore, even fill the character of a purchaser with notice, who by the rules of equity may purge his guilty conscience by purchasing from one whose clear conscience and legal title place him beyond the jurisdiction of equity; the immunity of an innocent purchaser cannot be imparted to the fraudulent usurper of another's rights without purchase.
But there is one circumstance, which saves us the necessity of considering the defects in the averments of the answers or proofs of the deed from Newland and wife to Clay, or from him to Chiles.
*214] *Chiles states, in his answer, that being unable to prove notice to Green Clay before his purchase from Newland and wife, he purchased from Clay; yet he did so establish the fact of Clay's guilty purchase; that he obtained a decree against him in the Bourbon court. He purchased from Clay, while that decree was in full force; and now appears on the record, claiming to be protected under this purchase by the equity of Clay, as an innocent purchaser; when Clay, after being an adjudged mala fide purchaser, by the final decree of a court of competent jurisdiction, clothed Chiles with his own character by his deed in 1825. It would present the administration of equity jurisprudence in different courts on very different principles, if Clay, who could not protect himself in a state court at the suit of Chiles, could protect Chiles here, at the suit of Boone; or that Chiles, after procuring the decree against Clay, in a suit to which he made Thomas Boone a plaintiff, on the ground that he purchased with notice; should now obtain a decree against Boone, on the ground that Clay was an innocent purchaser, for a valuable consideration fully paid, without notice of any defect in his title, till it was complete at law by a conveyance in fee, and in equity by the actual payment of the money. Neither the pleadings, the exhibits, or the evidence on this record, afford us any warrant for such a proceeding: on the contrary, they make it our duty to decree a conveyance from Chiles to the plaintiffs, of whatever right or title he may have acquired by the deed from Green Clay.
We are next to consider the case of the plaintiffs, as to the other defendants. The heirs of South, by their answer, disclaim any interest in the land; nor does it appear that the heirs of Hezekiah or *161 George Boone have any interest in the land or at any time have been in possession, or held any title under Hoy's patent. As to these defendants, therefore, there is no subject-matter for any decree, except for the dismission of the bill.
As to the heirs of Hoy, the plaintiffs have made out an undoubted right to a conveyance of the legal title. Those who have answered, set up no title or claim to the land; and they must execute the trust which has descended to them, by conveying their legal title to the plaintiffs.
*John Evalt is admitted to have been in possession for more [*215 than twenty years, under an adverse title by patent to Flournoy. The plaintiffs have, therefore, no right to the land thus held.
Nicholas Smith states, in his answer, that he holds fifty acres of the land claimed by the plaintiffs, by purchase from John Jones, by deed, which he makes an exhibit in the cause; that this fifty acres is a part of Flournoy's patent, which he holds adversely to the claim of Searcy. The deed is dated in December, 1797, conveying, in consideration of one hundred and twenty-five pounds, fifty acres of land, with general warranty. Independently of the deed from Jones, it is clearly proved by several witnesses, that Smith made the purchase from him; settled on the land in 1798, where he lived till his death; and that there was a continued possession and residence on the land by him, and those claiming under him, to the present time, and valuable improvements made. The plaintiffs do not controvert this purchase or residence; they do not charge Smith with any act affecting his conscience, or show that he ever purchased, or made claim under them, or any person asserting any right under their title. The title of Flournoy appears to be by an equity older than Searcy's; though his patent is later than Hoy's. We can perceive no ground of equity, to entitle the plaintiffs to a conveyance of the title thus acquired by Smith. He and those under him, have had an adverse possession of twenty-five years, before the bringing of this suit; and his possession of the fifty acres cannot be disturbed, either at law or in equity.
The only charge in the bill against the remaining defendants, in their combining to institute the suit in the Bourbon court, of which there is not only no proof, but the contrary appears by the record of that suit; they were not parties, and took no part in the prosecution of it. The bill, however, alleges that Chiles "had made some engagement to maintain Smeltzer, Smiths, Cummins, and Baylor, in detaining possession, and enjoying the profits for a long time past, still refusing to surrender. The prayer against them was "to compel the defendant, Chiles, or such of the defendants as now hold the title, to convey the tract described by the deed under the decree to Chiles, to account for rents and profits, and such other and further relief as his case may require." *The answer of Nicholas [*216 Smith, Jr., Nicholas Smith, Sen., Jacob Smith, and George H. Baylor, was joint and several; jointly they denied being parties to the Bourbon suit, or being bound by the decree. They admit that *162 Searcy claimed the land; that it was located by Martin, and patented to Hoy; allege a surplus of five or six hundred acres in the survey; and that plaintiff could be satisfied without disturbing them; plead the lapse of time, and staleness of the demand as a bar; and deny the right of the plaintiffs to recover. They state that they have been informed, that Hoy assigned Searcy's bond to George Boone; call for proof of the assignment to Thomas Boone; charge that if the bond was assigned to him, it has long since been cancelled between Thomas and George Boone; that George Boone assigned the land to John South, investing him with all the title to the land, which George Boone derived from William Hoy, by the agency, consent, and authority of Thomas Boone, if the bond was ever assigned to him. They also charge, that South, by virtue of such assignment, held the bond till his death, and that his executor held it, till Chiles obtained it by fraud; and that they are entitled to certain parcels of land, by purchase for a valuable consideration, from John South. They then aver, that Peter Smeltzer purchased four hundred acres, and took South's bond, with surety, for the title; took possession of the same in 1791, settled upon, improved, and resided on it till his death. That George H. Baylor claims under Smeltzer by purchase from his heirs, for a valuable consideration; now resides upon it; and that a continued residence has been kept upon the land, on which there are large and valuable improvements. That Nicholas Smith holds two hundred acres, by purchase from Jacob Swope, in 1797, who purchased from George Pope, 1795, who purchased from South, in 1794. That Smith resided on this land from 1798, and made valuable improvements thereon; which residence has been continued by him, and those under him, to the present time. These defendants, then charge, that Thomas Boone was in Kentucky in 1802, 1810, and 1819; knew of the sales by South of the land they occupied, but gave them no notice of his title; and, on the contrary, disclaimed it, in conversation, and then proceed to give an account of their connexion *217] *with Chiles, in substance, as follows. He came to the Smiths and Smeltzer, stating that he held Hoy's legal title to the land; that South's bonds were worth nothing, and they would lose the land and improvements: whereupon they, ignorant of their rights, and the title to the land, compromised with Chiles, agreed to give him up South's bonds, and to pay him ten dollars an acre, in three annual instalments, for six hundred acres, each to pay for his own share. Chiles was to make them Hoy's title, but having received South's bonds, he obtained from his executor the bond of Searcy; struck out the assignment to South; gave up his bonds to his executor; shortly after which, he commenced the suit in the Bourbon court, and obtained the decree referred to in the bill. They charge Chiles with fraud in the whole transaction; pray that their answer may be taken as a cross bill against Chiles; that he be compelled to restore the bonds of South; or that they may have such a decree against him as their case may require, and their contract with him cancelled. They deny the plaintiffs' rights to rents and profits in case *163 of recovery: but if they lose the land, pray a just compensation for their lasting and valuable improvements; and then set up a contract between Thomas Boone and a certain Boon Engles, in 1822, in pursuance of which, the present suit was brought by him in their names; which they allege to be within the statutes of champetry and maintenance, on which they rely, as well as on the common law, the rules and principles of equity, and the statute of limitation. Cummins claimed by purchase from Smeltzer, which his heirs, in their answer, aver to be fraudulent; but if it is valid, they set up thirty years' possession of part of the land before suit brought, as a bar. Nicholas Smith, by an amended answer, refers to a copy of Searcy's bond, with all the assignments thereon, previous to the erasure of the assignment by George Boone to South; "under whom all the tenants in possession, including this defendant, claim their several portions of said seven hundred acres of land; which assignment bears date August 6, 1792." "And if said South, as executor of William Hoy, had ever sold any portion of said one thousand four hundred acres, or the moiety, seven hundred acres, claimed by complainants herein, (for this seven *hundred acres was never defined to any of the [*218 original purchasers previous to said assignment, which is not admitted,) this defendant relies confidently that said assignment last mentioned of said bond to him, said South, would enure in equity to confirm their claim; nor could its subsequent cancellation, or the surrender of said bond, with the consent of the executor or administrator of South, affect or impair their claims. He re-exhibits the copy of said bond, with the several assignments thereon, and relies on time and circumstances, to show that the one from George Boone to South was done by proper authority from Thomas Boone."
The cause was at issue on the general replication. At the hearing, all the material facts alleged by the defendants in relation to their purchase from and under South, their agreement with Chiles, the surrender of South's bonds to his executor, and the delivery by him to Chiles of Searcy's bond, with the assignments thereon, were fully established by the exhibits and proofs in the cause; as, also, their possession, residence, and improvements on the land as stated in their answer. But they wholly failed in proving that the assignment of Searcy's bond by George Boone to John South, was made with the knowledge, consent, or authority of Thomas Boone.
South married a daughter of William Hoy, to whom he was executor; the agreement between Chiles, the Smiths, and Smeltzer, was made in 1817; South's bonds were given up in the winter of 1817-18, when Chiles received the bond of Searcy; the suit in the Bourbon court was commenced in January, 1818, and is yet pending.
This suit was commenced in 1823, while the decree of the Bourbon court was in force, and before any appeal to the court of appeals of Kentucky: it was before this court in 1834, on a certificate of division from the circuit court of Kentucky, on the question whether they had jurisdiction of the cause. It was then decided that it had jurisdiction; that the heirs of Hoy were not necessary parties, except for *164 the purpose of obtaining the legal title if it remained in them; that a decree might be made without them, as to parties properly before the *219] court; that the heirs of *George Boone were not necessarily defendants, and no proof need be made respecting them. 8 Pet. 535, 7. All questions of jurisdiction of parties are therefore closed.
The objections to the plaintiffs' recovery on the ground of the contract between Thomas Boone and Boon Engles being within the statutes of champetry and maintenance, cannot be sustained, for two reasons:
1. The English statutes on this subject, which were adopted in Kentucky, punished the offence and declared the contract for maintenance void between the parties, but did not direct or authorize the dismission of the suit instituted between other parties in furtherance of such contract. Boon Engles is no party to this suit; and it does not concern the defendants whether it was commenced and is conducted by his agency, or by the plaintiffs themselves: the right of plaintiffs is not forfeited by such an agreement, and it may be asserted against the defendants whether the contract with Boon Engles is valid or void. S.P. Litt. Select Cas. 522.
2. By the act of 1798, which was in force when this contract was made and suit brought, no person could be prevented from prosecuting or defending any claim to land held under the land laws of Virginia; nor shall any suit brought to make good such claim be considered as coming within the provisions of the common law or any statute against champetry or maintenance. 1 Mor. and Brown, Kent. Stat. 282, 5. These statutes were not revived till 1824.
The first question of fact which arises, is in what right the Smiths and Smeltzer first entered upon the land purchased from South. The amended answer of Nicholas Smith, Junior, is explicit on this point; stating that all the tenants in possession, including himself, claim under South, by the assignment of George Boone to him. Though this answer is not evidence against the other defendants, yet, as they do not deny notice of the assignment to Thomas Boone, before their purchase, and in their answer pray for a restitution of South's bonds, there is good reason to believe the statements of Smith, especially in connexion with the proofs in the cause.
*220] *Barbara Smeltzer, the widow of Peter, testifies that he settled on the land in 1791; South came down and marked out the four hundred acres; that it was held under South, who claimed under the bond from Searcy, assigned by Hoy to George Boone. That at the time they first settled, South represented to Smeltzer that he had traded for that bond; they were soon after informed that he had not got the bond, but soon after obtained it from George Boone; that Smeltzer soon afterwards informed George Boone of what had been done, who appeared well pleased.
William Johnson testifies that Smeltzer purchased from South, and began to improve in 1786. L. Eastin states that he took possession in 1789. It is also testified by William Boone, that South had sold *165 before he got the bond from George Boone; and the evidence of Mrs. Smeltzer is strongly corroborated by Benjamin Mills, Esquire, to whom some of the Smiths and Smeltzers made a professional application relative to the chain of title between South and Hoy. He found no authority to George Boone to assign the bond to South, which was the only claim, or colour of claim, he had to the land; hence and from his knowledge of South's character, he concluded he had sold without claim, and brought no suit for them. Joseph Steele testifies to the declaration of George Boone, that South was in treaty with him for the bond, for some time before the assignment was made; and that Smeltzer was informed previous to his purchase, that the land belonged to Thomas Boone. No objection having been made on the hearing to the deposition of Steele in relation to the declarations of Boone, they are competent evidence; and in connexion with that of the other witnesses, fully support the testimony of Mrs. Smeltzer, and the amended answer of Smith. We must, therefore, consider Smeltzer as having purchased from South, his right under the bond of Searcy, and the several assignments down to South, with notice thereof. Smith's amended answer is conclusive, that he so purchased the two hundred acres in 1797, by the assignment of South's bond. In his deposition he also states, that he soon afterwards purchased from South sixty or seventy acres, in addition, of which he took possession, and *has ever since held, under the same claim; that he [*221 lent South three hundred dollars, which was to go in part payment of the land, but finding South had no title, he recovered it back by suit.
In 1817, the parties stood thus: Smeltzer had been in possession under a claim of title by Searcy's bond and assignments for twenty-six years, of four hundred acres. Smith had held possession of the two hundred acres nineteen years, which, added to the possession, of Pope and Swope from 1794, made twenty-three, and of the sixty or seventy acres for about eighteen years, when they gave up South's bonds, and agreed to purchase from Chiles, who claimed the legal title of Hoy. During this time, Thomas Boone had neither affirmed nor disaffirmed the sale by South, made no entry on the land, gave any notice to Smith or Smeltzer, instituted no suit, or made any effort to obtain the legal title from Hoy's heirs; though his right was then the same as now made out, and had been vested in him for thirty-six years. He made George Boone his agent in 1787; yet, for thirty years he appears to have been wholly inactive, in asserting or endeavouring to complete the title. The agreement with Hezekiah Boone in 1802, seems to have been the only positive assertion of a right in the land made by Thomas Boone. When the present suit was commenced, Smeltzer, and those under him, had been in possession thirty-two years; Smith twenty-five years of the two hundred acres, and twenty-one of the sixty or seventy acres; and the equity of Boone arose forty-two years before.
From this state of facts, it is perfectly clear, that, if Smiths and Smeltzer can be considered as claimants in their own right, adverse *166 to the title of Thomas Boone, the lapse of time alone is a complete bar to any equitable relief: the rules of equity as to the effect of time in favour of possession, are too well settled to be stated or doubted. 2 Jac. and Walker, 138, &c.; 9 Wh. 497; 10 Wh. 168; 3 Pet. 52; 6 Pet. 66; 5 Pet. 491; 7 J.C. 122; 10 Wh. 150, 74; 9 Pet. 416.
Thomas Boone's only standing in a court of equity, is by considering these defendants as his trustees, by their purchase under South or Chiles, or both. As neither of them sold by any lawful authority *222] from him, he is not bound by, and may *repudiate their acts; the consequence of which, would be a bar of his claim on these defendants holding adversely. But as South assumed the right to sell the interest of Thomas Boone, in virtue of the assignment from George Boone, as his attorney in fact, and Chiles acted throughout all his proceedings, under the agreement signed by George Boone in the same capacity, which was an express recognition of the original right of Thomas Boone; he may waive the defect in the power of attorney, ratify the acts of his agent, and elect to consider the purchasers from South and Chiles as holding through and under him. When the purchasers from them discovered that neither South or Chiles had any right in the land, they too had a right of election to hold under the title which they intended to purchase; under which they had taken possession of the land, and held it till the discovery of the fraud: or to disclaim the purchase, renounce all rights consequent upon it, and remain in possession as claimants adverse to the title under which they entered.
It is unnecessary to decide on the effect of such disclaimer, had it been made before the purchase from Chiles, or the filing the bill. We cannot find in the evidence or pleadings, that Thomas Boone ever made any election, as to considering these defendants holding under or adverse to him: but it is very clear that they originally purchased, entered, and held under his title; and it does not appear that they ever assumed an attitude of direct hostility to it. We have come to the conclusion, that we must now consider them, as holding by their original claim, so far as to authorize the plaintiffs to make them their trustees, in virtue of their purchase from South, and ratify the agreement of Chiles. There is no other way in which the plaintiff can escape from the consequences of the staleness of his equity, coupled with the long possession of the defendants, than by considering them as friendly purchasers and possessors under them. The plaintiffs put themselves out of court, by setting up the purchase and possession of defendants as adverse to their equity: for they then would have no protection against the lapse of time, which they have neither explained or accounted for. 17 V. 88, 9, 96; 1 J. and W. *223] 62, 3, and note; 1 J.C. 47, 8; 3 J.C. 586; 1 J.C. *354; 5 J.C. 187, 8; 3 J.C. 218, and all bills in equity which seek to disturb long possessions, deserve the utmost discouragement. 1 Atk. 467; 1 J. and W. 62.
The plaintiffs must, therefore, make their claim on the defendants, *167 as their trustees, by direct contract, or by implication from the purchase under their title; in either case, the lapse of time affects them. They cannot enforce the execution of an express voluntary trust, after its known disavowel for such time, and under such circumstances as would make an adverse possession a bar. 3 Pet. 52; 7 J.C. 122; 2 Sch. and Lef. 607, 36, 8. If a purchaser is made by implication an involuntary trustee for the vendor, so as to be affected by his equity, it must be pursued in a reasonable time. 4 J.C. 316; 3 J.C. 216, 17; 4 B.C. 136, 8; 1 Cox 28, 17; V. 96, 160.
Though time does not bar a direct trust, as between trustee and cestui que trust, till it is disavowed; yet, where a constructive trust is made out in equity, time protects the trustee, though his conduct was originally fraudulent, and his purchase would have been repudiated for fraud. 4 B.C. 136; 17 V. 97; 1 B.C. 554. So where a party takes possession in his own right, and was prima facie the owner, and is turned into a trustee by matter of evidence merely. 3 J.C. 216. And where one intending to purchase the entire interest in the land, took a conveyance without words of limitation to his heirs, passing only an estate for life, the lapse of fourteen years, after the expiration of the life estate, was a protection to the heirs of the purchaser. 5 J.C. 185, 6.
What the reasonable time is, within which a constructive trust can be enforced, depends on the circumstances of the case; but there can be few cases where it can be done, after twenty years' peaceable possession, by the person who claims in his own right, but whose acts have made him a trustee by implication. His possession entitles him to at least the same protection as that of a direct trustee, who, to the plaintiffs' knowledge, disavows the trust, and holds adversely; as to whom the time runs from the disavowal, 3 Pet. 52, because his possession is thenceforth adverse. The possession of land is notice of a claim to it by the possessor, Sugden Vend. 753, 4; if not taken and held by contract *or purchase, it is, from its inception, [*224 adverse to all the world, and in twenty years bars the owner in law and equity. 8 Cr. 250; 4 Wh. 221; 5 Pet. 354. A purchaser in possession by a contract to sell, is in law a trespasser; but in equity he is the owner of the estate, having taken possession under the contract, and the vendor is in the situation of an equitable mortgagor. 15 V. 138. If the entry was by purchase, and the purchaser claims the land in fee, he is not a trustee; his title, though derivative from, and consistent with the original title of the plaintiffs, is a present claim in exclusion of, and adverse to it. A vendee in fee, derives his title from the vendor; but his title, though derivative, is adverse to that of the vendor: he enters and holds for himself. Such was the doctrine of this court in Blight's lessee v. Rochester, 4 Pet. 506, 7. In that case the court said, "The vendee acquires the property for himself, and his faith is not pledged to maintain the title of the vendor."
"The only controversy which ought to arise, respects the payment of the purchase money; how far the vendee is bound to this, by law, *168 or by the obligations of good faith, is a question depending on all the circumstances of the case.
"If the vendor has actually made a conveyance, his title is extinguished in law as well as equity; if he has sold, but has not conveyed, his contract of sale binds him to convey, unless it be conditional; if, after such a contract, he brings an ejectment; he violates his own contract, unless the condition be broken by the vendee; and if it be, the vendor ought to show it." "If defendant claims under a sale from plaintiff, and plaintiff himself is compelled to assert that he does; then the plaintiffs themselves assert a title against this contract. Unless they show that it was conditional, and that the condition is broken, they cannot, in the very act of disregarding it themselves, insist that it binds the defendant in good faith, to acknowledge a title which had no real existence. Upon reason, then, we should think, that the defendant in this case, under all the circumstances, is at liberty to controvert the title of the plaintiff." 7 Wh. 548, 50.
In applying these principles to the case before us, it is very clear *225] that neither the purchase from South or Chiles, is any *equitable estoppel to the defendant's controverting the title of Boone, when he disaffirms and violates the contract of purchase, by seeking to turn them out of possession. He cannot make them constructive trustees by their purchase, and then be permitted to disavow the purchase, without subjecting himself to the consequences of delaying the prosecution of his right. As trustees by implication, in equity, they may claim the benefit of the lapse of time; if he considers them as purchasers from him, or by a title derived from him, he can have no hold upon their conscience, to surrender him the possession, if they are willing to pay the purchase money. Whether they purchased from him, or from another who assumed to sell by his authority and in his right, matters not; if they claim by his title, and thus become his trustees by his affirmance of the sale, the law of equity compels him to assert his rights in a reasonable time. When he does so, the execution of the trust will be enforced; but it will be enforced on both parties according to the terms of the purchase, and the trust which equity raises on it by implication. Equity makes the vendor without deed, a trustee to the vendee, for the conveyance of the title; the vendee is a trustee for the payment of the purchase money, and the performance of the terms of the purchase. But a vendee is in no sense the trustee of the vendor, as to the possession of the property sold; the vendee claims and holds it in his own right, for his own benefit, subject to no right of the vendor, save the terms which the contract imposes; his possession is, therefore, adverse as to the property, but friendly as to the performance of the conditions of purchase.
In virtue of his legal title, the vendor has a legal right of possession; but equity will not permit him to assert it, unless the vendee has violated the contract: he will be enjoined if the vendee performs it. It is very certain, that a sale of the legal title by deed creates no legal *169 estoppel, by which a purchaser is prevented from contesting the title of the vendor, or the title of any person from whom the vendor derived title. 7 Wh. 547, &c. It is equally certain, that the sale of an equitable title by bond, or other contract, cannot have a contrary effect in equity; which *decides according to the equum et [*226 bonum of each case. In this case, Boone comes into court to obtain possession under an equitable title only; he is barred by time, unless he can make the defendants his trustees at the institution of the suit; he charges them with no fraud, and nothing is averred or proved against them so to affect their conscience, as to give a court of equity jurisdiction. He is thus compelled to rest on their purchase of his title from South and Chiles, making them constructive trustees; which, on the pleadings and evidence, we are of opinion he may do. There is, then, a trust between them; but it is that trust which, in equity, results from the contract of purchase. Boone is a trustee for such title as the defendants purchased, and were entitled to receive; they are trustees for the purchase money they agreed to pay for it. Boone avers they bought his title, which, we think, is made out. He, then, is the cestui que trust as to the money, and they for his title.
To divest this trust of all mutuality, would be subversive of every rule of equity; it will never award a surrender of the possession of land by a purchaser of an equitable title, but on a clear violation of the condition of purchase, clearly proved by the plaintiff. He is without remedy at law in this case; compelled to come into equity, he must do it; he sets up a trust in the defendants for his use: all he can ask is its execution by payment of the purchase money: if he has a decree for that, justice is done to him; and nothing can be more just than to decree that he shall perform the act in consideration of which he obtains relief. If he comes into court to turn them out, on the ground that defendants have purchased a title which must be traced up to him, in virtue of the contract of purchase; he asserts a title against this contract, when he denies them the benefit of the purchase: and in the language of this court in Blight v. Rochester, the plaintiffs cannot, in the very act of disregarding it themselves, insist that it binds the defendants, in good faith, to acknowledge the title. The defendants may contest it, when set up to defeat the purchase in this case in equity, as it was done in that at law. This court did not then think their decision to be *at variance with the [*227 decisions of the court of Kentucky; nor do we think that we now, in any way, interfere with them.
They have held that the possession of the purchaser from the plaintiff without deed, is friendly to the plaintiff; and stops the running of the statute of limitations. 2 Bibb, 506. But that a vendee by deed, may, at law, contest the title of the person under whom he bought; though a vendee by executory contract cannot, if he is in possession under, and looks to the vendor for the completion of his title: in the first case he holds adversely, in the second not. 3 Littell, 135, 6. So, if he purchases from the patentee, and holds his *170 bond for the title, 5 Litt. 318, a defendant cannot, in ejectment, set up an outstanding title in a third person, if he purchased from plaintiff without deed, 6 Litt. 444: nor can a tenant or one who purchases from him, contest the title of the landlord. 4 Bibb, 33; 2 Marshall, 243.
These decisions are, unquestionably, correct; but the principle on which they are founded, is very different from that which the plaintiffs' counsel deduce from them: they admit that possession, under a deed conveying a legal title, is adverse, and that a defendant so holding may deny the title of his vendor in a suit at law. The contract of purchase, then, is no estoppel, though by the most solemn instrument known to the law. The same principle seems closely applicable, by analogy, to a suit in equity, in which the plaintiff rests on an equitable title only, which has been sold to the defendant, as the foundation of a decree awarding possession of the land purchased; the proceeding is analogous to an ejectment; the process of executing such a decree is the same in Kentucky, by an habere facias. It is difficult to perceive any sound reason why the same analogy should not be observed in the proceedings previous to the decree: if the defendant, a vendee of the legal title by deed, can at law contest the title of his vendor who is plaintiff, why may not the vendee of an equitable title by bond or other executory contract, enjoy the same right in a court of equity? We are clearly of opinion that the defendants in this case had such right, and that there is nothing in the evidence before us which could have deprived them of it, had they rested their case upon their adverse possession alone; but *228] *the admissions of Smith in his amended answer, the proofs of the cause as to Smeltzer, together with the joint answer of themselves and Baylor, place them in a different position.
As to them, we are perfectly satisfied that their possession was a perfect protection against the equity of Thomas Boone when this suit was instituted; but we think that his equitable right to the purchase money agreed to be paid to Chiles, has been saved by their answer and the evidence in the case; our only difficulty has been, whether we can, on the pleadings, make such a decree as, in our opinion, comports with the justice and equity of the case. The specific prayers of the bill are, that such of the defendants as hold the title, convey to the plaintiff the tract described by the deed under the decree to Chiles; neither Smiths, Smeltzer, or Baylor hold this title, or claim under the decree or deed from the commissioner to Chiles; this part of the prayer cannot, therefore, be granted. The next is an account for rents and profits; this can be done as to Chiles, but cannot as to the others, on our views of the case. The general prayer is, such other and further relief as the plaintiffs' case may require. This is a broad prayer, on which such relief may be granted as is not inconsistent with the bill or the specific prayers. 8 Pet. 536. This case is one of an undoubted equitable title to the 700 acres of land, had it been pursued in time; but under the circumstances of the case it is narrowed down to a claim for the purchase money of the land, *171 held by the defendants under the purchases from South and Chiles, at the price stipulated in their agreement with the latter. This we think is required by the case of the plaintiffs, as it appears on the whole record, without placing the defendants in any position more injurious to themselves than their answer would authorize. They pray for a restoration of South's bonds, and the rescision of the contract made with Chiles, as the means of enabling them to obtain a decree in their favour. "But should, under all the circumstances of the case, it be their misfortune to lose the land, they claim a just compensation for their lasting and valuable improvements; under such rules and regulations, according to law and equity, as their case may require and justice demand." To restore South's bonds and annul the *contract with Chiles, would not release them from [*229 their trust to Boone for the purchase money agreed to be paid to South. The record does not inform us what was the price at which South sold the 600 acres; but if sold at the rate at which Smith bought the 60 or 70 acres, it would, with the interest, exceed the price agreed to be paid to Chiles. Besides, the restoration of South's bond at the time of their answer, and by a decree of the circuit court, would have bound them to pay the purchase money with interest. In such case, the lapse of time would be no bar. If by our decree, these defendants hold the lands on the terms stipulated with Chiles, they have the same benefit of their contract with him, as if it had been consummated by a conveyance of the legal title of Hoy, and the equitable title of Thomas Boone; a position much more favourable to them, than they would be placed in by their prayer for their restoration of South's bonds, or for mere compensation for improvements. It is not to be doubted, that they would have been content with the quieting of their possession on paying for the land, on the terms agreed on with Chiles in 1817, on which they can now hold them, consistently with the law of the case.
Though neither of the parties have prayed for the specific relief which we think they were entitled to; we are of opinion that all have, in substance, submitted their case to our consideration, according to the rules and principles of equity: willing to abide such decree as we shall think will do justice between them. This, in our opinion, will be done by giving to both the benefits of the contract with Chiles, which, under all the circumstances of the case, created by construction and implication in equity, a mutual trust; which is executed by one party conveying his title, and the other by paying the purchase money.
It remains only to consider the case of Cummins, who purchased from Smeltzer, part of the 400 acres purchased by him from South. We can perceive no equitable ground of discrimination between this and the other tenants; the answer of the heir of Cummins admits the purchase from Smeltzer, but makes the same allegation of fraud against him as he did against Chiles. Yet, like the others, Cummins continued to hold, and his heir still holds the land so purchased, without, as appears by the *record, having paid any [*230 *172 thing for it: like them, too, the heir prays for a dismission of the bill, but in these words; "And hence to be dismissed with her costs, &c., and such other orders as the court shall deem necessary to the equity of her case." This could not have been intended, nor can it be considered as a peremptory prayer for dismission, as she would, in such case, hold the land without paying for it; there would be no remaining equity in the case, on which the court could make an order; it must, therefore, be considered as a submission to such decree as the court should deem conformable to the equity of the case. This, in our opinion, requires that this defendant should be placed in the same situation as the other defendants, who claim under or by the purchase from South; they all purchased only an equitable title, and must stand in the place of those from whom they purchased; each is a trustee by implication, affected by the same mutual trust in equity.
Having thus disposed of all the contending claims between the plaintiffs and the defendants, in this very complicated case, according to their respective equities between them as contending parties; we are to consider of the decree to be made between the defendants. It is within the undoubted powers of a court of equity to decree between co-defendants on evidence between plaintiffs and defendants. 2 Sch. 1 Lef. 712. Its exercise is also within the general prayer of the defendants in their respective answers; and is called for by every consideration, that requires some termination to long, inveterate, and entangled litigation. With the whole case before us, and on the fullest investigation of the rights of all the parties, we do order, adjudge, and decree therein as follows:
That so much of the decree of the circuit court as directs the defendant Chiles to convey to the complainants, all his right, title, and interest to and in the premises named in the bill, and to deliver up to the clerk of said court, to be cancelled, the contract between said Chiles, Hezekiah and George Boone, therein referred to; also, so much thereof as orders Jones and Fanny Hoy to convey all their interest in the premises, derived from William Hoy; and so much of *231] said decree as directs, that if the *conveyances so directed shall not be made as ordered, the clerk of said circuit court shall convey to the complainants the interest of the said parties, as by said court decreed; and so much of said decree as orders the defendant Chiles to pay the costs of the suit, with the exception there stated; also, so much of said decree as declares that the claim of the complainants is not to be prejudiced by the decree aforesaid, as against any of the heirs of William Hoy, who are not parties to this suit; and so much of said decree as directs the bill of complaints to be dismissed as to the land held by John Evalt within the bounds of Flournoy's patent; be and the same is hereby affirmed in all things, excepting that part of said decree which excepts from the deed to be executed by William Chiles, the interest which he holds under a deed from Green Clay, as to which the said decree is reversed and annulled.
And as to the rest and residue of said decree of the circuit court, *173 the same is hereby reversed and annulled; and this court, proceeding to render such decree as the said circuit court ought to have rendered, doth further order, adjudge, and decree 
That the said William do, and shall, within six months from this time, convey to the complainants (in the manner specified in said decree as to the land therein directed to be conveyed by him) all his right, title, and interest, held or claimed under the deed or conveyance from Green Clay to said Chiles.
That the said Chiles do, and shall, within the same time, assign, transfer, and make over any contract or agreement made between him and any other persons, in relation to the land in controversy in this suit, whereby any right accrued to, or was promised or agreed to be in him to any part of said land, or any money arising or to arise from any sale or sales thereof; and in like manner to transfer, assign, and make over all such rights to said complainants.
That the said William Chiles do also account to and with the complainants, for any money he may at any time have received from any person or persons, on or by virtue of the sale of any part or parts thereof; also that he account to and with the complainants for any rents or profits which he may have enjoyed or *received in or [*232 from said land embraced in the patent to Hoy, under the direction of said court.
That a surveyor, to be appointed by said court, do, under their directions, ascertain the quantity of land claimed by the several defendants in this suit (except William Chiles,) on the western side of the survey in Searcy's right, designated on the plat of the surveyor, dated 2d October, 1831, by the letters A, D, T, U, J, K, M, E, and A; excluding therefrom all the lands within the lines of Flournoy's patent, and return a plat thereof to said court.
That the bill of the complainants be dismissed as to all the land claimed by any defendant, east of the lines on said plat, designated by letters E, M, K, J, U, T; that their bill be dismissed, as to all the land purchased by Nicholas Smith from Jones, lying within the line of Flournoy's patent, marked on the surveyor's plat, in page 66 of the printed record, by the letters L, M, N, O.
That possession be awarded to the complainants, by the several defendants, of the land claimed or held by them, respectively, within the lines first herein referred to, as marked in the plat, dated 2d October, 1831, and without Flournoy's line, which has not been purchased from, or held under, South or Chiles, or by any person or persons claiming or holding under them, or either of them, in virtue of any contract or agreement with them or either, by or under whose right, claim, or possession, any of said defendants claim or hold any part or parts of said land.
That the surveyor, so to be appointed, do and shall ascertain the quantity of land now claimed or held by any of the defendants, mediately or immediately, by, from, through, or under South or Chiles, or in virtue of any right asserted or claimed by them, or either, as aforesaid; designating especially the quantity claimed or held by each *174 defendant, or each class of claimants, under any one person, accordingly as they may hold or claim in severalty, or in common between themselves; and return separate plats thereof to said circuit court. Whereupon, such of the complainants as are under no legal disability, shall, within such time as the said court shall direct, make, execute, *233] and in due *form of law acknowledge and deliver to the said defendants respectively, deeds of general warranty in fee, for the land described in such plats, on said defendants complying with this decree, as hereinafter mentioned: and that such of the complainants as may at such time be under any legal disability to make such deeds, shall, within six months from the removal of such disability, make, execute, acknowledge, and deliver such deeds to the defendants, their heirs, and assigns; or that the said circuit court, as so authorized by law, may order and direct that such deed or deeds shall be made by such commissioner as they may appoint to execute the same, for and on behalf of the complainants last mentioned.
That the said defendants severally, or each class thereof as aforesaid for themselves jointly, as they may claim or hold, do pay to the complainants for the land conveyed by them, at the rate and on the terms stated in the joint answer of the defendants, to wit, ten dollars for each and every of the four hundred acres purchased by Peter Smeltzer, and the two hundred acres purchased by Nicholas Smith from John South; to be paid in three equal annual instalments, counting from the agreement with Chiles, assumed to be 1st December, 1817.
That the heirs of Nicholas Smith, or the defendants who claim or hold under him or his heirs, do pay to the complainants at the same rate, and on the same terms, for the sixty or seventy acres afterwards purchased by said Smith from South; which said complainants shall convey as aforesaid to the defendant or defendants in possession thereof under Nicholas Smith.
That the amount so paid to be paid by each defendant, or class of defendants, bear interest from the time the instalments were payable respectively, till the time directed by the circuit court, at which the complainants are to make the deeds as aforesaid; each defendant or class to be liable only for the sum due by themselves, and not for any sum due by other defendants.
That, when the said deeds shall be executed and delivered, the sum due by each defendant or class, principal and interest, shall be paid as follows: one third thereof to be paid in one year from the *234] delivery of the deed, one third in two years, and *one third in three years, with interest from the time they are payable.
That the several sums so payable be paid into said court, or to such person or persons as said court by their decree shall order and direct; and on such terms and conditions as to them shall seem just and equitable.
That the defendants severally and respectively do, under the direction of said court, account to and with each other for any moneys received by one from the other, or any person or persons under whom *175 they claim or have claimed, for or on account of any purchase money of any part or parts of the land, now or at any time held or claimed by them or any of them, under or in virtue of any purchase under the title of Searcy.
That such of the heirs of William Hoy as have answered the bill of complainants, do convey to them, in the manner directed in the decree of the circuit court as to Jones and Fanny Hoy, all their right, title, and interest in the land contained within the line of the plat first herein referred to, being the western part of the survey aforesaid, in right of Searcy. In default of making such conveyance, as is herein directed to be made, by any of the defendants in this case; then this court doth further order and direct, that a conveyance of the right and title, interest and claim, in and to the land in controversy, held or claimed by such defendants; be conveyed to the complainants, by a commissioner, to be by the said circuit court appointed to make such conveyance according to law.
That the bill of complainants be dismissed, as to the heirs of George Boone, Hezekiah Boone, and the heirs of South, with costs.
And it is further ordered, adjudged, and decreed, that all the equity of the complainants, as to any person or persons not parties to this suit, or as to any matter or thing, not herein decreed on, shall be and is hereby reserved to the said complainants, any thing contained in this decree notwithstanding; and that this cause be remanded to the circuit court for the district of Kentucky, with instructions to proceed therein according to this decree, and as to justice and equity shall appertain.
*Mr. Justice McLEAN:
Under the peculiar circumstances [*235 of this case, I am constrained to state, as succinctly as I can, the reasons why I dissent from the opinion just delivered.
The facts out of which this controversy arose, are as follows: Reuben Searcy being entitled to a settlement and pre-emption of fourteen hundred acres of land, in the settlement of Kentucky, on the waters of Licking, employed John Martin for one half the land to perfect the title. On the 24th September, 1781, for a valuable consideration, Searcy sold seven hundred acres of this land to William Hoy; executed his bond for a title; and, at the same time, assigned to Hoy the plat and certificate of survey, which enabled him, in 1785, to obtain a patent for the whole tract in his own name.
But before the emanation of the patent, in the month of December, 1781, William Hoy assigned Searcy's bond to George Boone, and bound himself, his heirs, &c., as sureties, &c. And on the 30th April, 1783, George Boone assigned the bond to Thomas Boone, whose heirs prosecute this suit.
Thomas Boone, being a citizen of Pennsylvania, gave a power of attorney to George Boone of Kentucky, dated 1st October, 1787, which authorized him, in the name of Thomas Boone, and for his use, "to ask, demand, sue for, and recover of and from Major William Hoy, of Kentucky settlement, a deed or other lawful conveyance *176 valid in law, for seven hundred acres of land in or near the waters of Hinkson and Stoner, &c.; and the attorney was authorized to appoint, &c., and to do every thing necessary in the premises," &c.
On the 6th August, 1792, George Boone, as the attorney in fact of Thomas Boone, assigned Searcy's bond to John South, the executor of William Hoy, who bound himself to cause Hoy's heirs to convey, so soon as they should become of age, the seven hundred acres to Boone, &c. But on the 23d December, 1791, before this assignment, South sold four hundred acres of the land to Peter Smeltzer, and bound himself with Walter Carr and John Glover, in the penalty of a thousand pounds, to make a deed for the same, so soon as the heirs of William Hoy, who was then deceased, should become of age. *236] And on the 26th *August, 1794, South sold two hundred acres of the same tract to George Pope, and bound himself in the penalty of five hundred pounds, to make a deed when Hoy's heirs should all arrive at full age. This last bond, in the spring of 1798, was purchased by, and assigned to Nicholas Smith, who shortly afterwards purchased from South the residue of the tract, supposed to contain sixty or seventy acres.
On the 30th November, 1802, Thomas Boone made an agreement with his uncle, Hezekiah Boone, of the state of Tennessee, to sell to him the whole of this tract of land, for seven hundred pounds. But Hezekiah Boone and his heirs had the option of taking the land or not, within four years from the time of the contract; and the contract was to be binding if he should make known his determination to take the land and pay for it within the four years. But there is no evidence that Hezekiah Boone made known his determination, within the time limited, to take the land; or that he has, at any time, paid the whole or any part of the consideration.
On the 30th October, 1817, Hezekiah Boone, and George Boone as attorney for Thomas, entered into an agreement with William Chiles, and delivered to him the papers they held respecting the above land; and Chiles was to have the free use of them, for the purpose of coercing the title to the land, if it could be recovered; and if not, he was to obtain the value. And Chiles was to use diligence in recovering the money or obtaining the title; and the proceeds of the suit, whether land or money, were to be divided between Chiles and Hezekiah Boone.
Shortly after this contract was entered into, Chiles, having obtained from George Boone the bond given him by South, which bound him to convey the land to Thomas Boone, so soon as Hoy's heirs could be compelled to make a deed; called on Peter Smeltzer's heirs, who held the bond of South, Carr, and Glover, and representing to them that he was the rightful owner of the land, obtained the bond; and, also, he obtained the bond for the two hundred acres given by South to Pope, and by him assigned to Smith; which bonds he delivered to Benjamin South, the executor of John South, who was *237] deceased; together *with the bond given to George Boone, by the deceased; and obtained from the executor, possession *177 of Searcy's bond and the assignments. The assignment of George Boone, as the attorney of Thomas, was then erased; and the contract between South and the tenants was cancelled. And the purchasers under South, purchased the land from Chiles, and bound themselves to pay for it ten dollars per acre.
At the August term of the Bourbon circuit court, in the year eighteen hundred and eighteen, Chiles brought an action of ejectment, in the name of Hoy's heirs, to recover possession of the land. The tenants having been served with notice, appeared and defended the suit; but a verdict was found against them, and a judgment was entered on the verdict.
On the 26th January, 1818, Chiles filed a bill in the Bourbon circuit court in the name of himself, Hezekiah Boone, George Boone, and Thomas Boone, against the heirs of Hoy for a title. In this bill, Chiles stated that William Hoy and John Sappington, and Parthena his wife, late Parthena Hoy, had conveyed their interest to him. And he sets up the contract with Hezekiah Boone, as the ground for a decree in his favour, under Searcy's bond, and the assignments made thereon. The assignment by George Boone to South, is represented as inoperative and void; as George Boone had no power, as the attorney of Thomas Boone, to sell or transfer the title to the land. The heirs of Hoy and others who were made defendants answered the bill. And afterwards, at August term, 1821, the court decreed that the complainant, William Chiles, was entitled to a specific execution of the contract from Hoy's heirs; and that, if the defendants did not execute a conveyance in pursuance of the decree, on or before a time specified, then, that Thomas P. Smith, as commissioner, under the statute of Kentucky, should execute it. And afterwards, on the 7th January, 1822, the heirs of Hoy not having executed a conveyance for the land, in pursuance of the decree, the deed was executed in due form by the commissioner.
In April, 1827, this decree of the Bourbon circuit court, was brought before the court of appeals of Kentucky, and reversed, *for want of proper parties; and the cause was remanded to [*238 the circuit court for further proceedings.
The heirs of Thomas Boone filed their bill in the circuit court of the United States, on the 25th January, 1823, at first against Chiles, Hezekiah Boone, George Boone, and the tenants who occupied the land; and represented that the bill filed by Chiles, in the name of Thomas Boone and others, against the heirs of Hoy, was a fraudulent proceeding; and as Chiles, under the decree, was supposed to be invested with the legal title, a decree for the title was prayed against him. And after the reversal of the decree of the Bourbon circuit court, such of the heirs of Hoy as were found within the jurisdiction of the court, were made parties.
The tenants answered, and relied upon lapse of time, their purchase under South, and the fraud of Chiles, in their defence. Chiles also filed his answer, setting up his title, and also Fanny Hoy, and Jones Hoy, the only heirs of Hoy who were made parties to the bill, *178 who admitted the right of the complainants. The material parts of the answers will be noticed more particularly, under the appropriate points which arise for consideration.
There seems to be no question as to the genuineness of Searcy's bond, and the assignments made upon it; but it is insisted that Searcy should have been made a party.
The bill asks no decree against Searcy. By the assignment of the plot and certificate, he enabled William Hoy to obtain the patent in his own name; and this was equivalent to a conveyance of the land, in discharge of the bond. Hoy, therefore, could have no demand upon Searcy, and of course the assignee of Hoy could have none against him. He was, therefore, not a necessary party. The complainants, under the assignment of Hoy, pray a divestiture of the title from his heirs; and as between these parties, there can be no doubt of the equity of the complainants. Indeed, the heirs of Hoy do not controvert the right of the complainants.
In the argument, it was insisted, that the seven hundred acres claimed by the complainants, are not so specifically described in *239] *the bill, as to enable the court to decree, in pursuance of the prayer, a specific conveyance.
William Hoy obtained in his own name a patent for the fourteen hundred acres; and it appears there is a surplus of more than five hundred acres. The bond of Searcy to Hoy was for seven hundred acres, and Hoy was to take his first choice out of the whole tract; and it appears that there does not remain of the entire tract, undisposed of, or not covered by paramount claims, more than will satisfy the above bond. And in addition to this consideration, the heirs of Hoy may be safely decreed to convey an undivided interest in the land, to the extent of the complainants' right: and, if necessary, the complainants, under such a decree, being tenants in common with the heirs of Hoy, or those who hold an interest in the land, could have partition made. There is no want of certainty as to the identity of the entire tract.
As to the claim of Chiles, except under the deed of Newland and wife, I admit that it cannot be sustained. Hezekiah Boone, who sold to Chiles, had no interest to transfer. His contract with Thomas Boone was a conditional one, and the conditions were not performed. No part of the consideration was ever paid, nor did Hezekiah Boone signify his determination to take the land within the four years limited; and failing to do this, the contract upon its face was not to be binding.
The assent which George Boone, as attorney in fact for Thomas Boone, gave to the contract, made between Chiles and Hezekiah Boone, was an extraordinary procedure on his part. And it is sufficient to say, that he had no power to sell the land, much less to consent that Chiles and Hezekiah Boone should divide between them the land or the money, whichever should be recovered. George Boone, as the attorney of Thomas, had power to authorize Chiles to act as *179 attorney or agent in endeavouring to recover the land; but he had no power to dispose of it in any manner.
As Chiles, by virtue of his contract with Hezekiah Boone, obtained conveyances of the interest of William Hoy and Parthenia Sappington, wife of John Sappington, two of the heirs of Hoy, *he must, [*240 under the circumstances, be considered as holding the land in trust for those who have the better equity. In no sense can Chiles be considered as a purchaser of this interest, without notice and for a valuable consideration. But the interest of Newland and wife, which was conveyed to him through Green Clay, rests upon different principles. In my opinion, Chiles must hold this interest as a purchaser from Clay, who was a purchaser from Newland and wife, without notice of the complainant's equity.
A majority of the judges reject the right asserted under this deed, because the allegation that Clay was a purchaser for a valuable consideration and without notice, is not made with the requisite proceedings in the pleadings, to admit proof of the fact; and, also, because the deed to Green Clay conveys to him no title.
And, first; as to the allegations contained in the pleadings. In his answer to the complainant's bill, Chiles states that, "he admits a certain Green Clay bought and received the title of John Newland and wife; and discovering this to be the fact, he caused the said Green Clay to be made a party to the bill in the Bourbon circuit court, charging him to be a guilty purchaser, knowing of the equity arising from the bond of Hoy. But said Clay put in his answer denying notice; and this defendant not knowing evidence to prove notice, bought of him his share and paid him therefor, and received his conveyance. This defendant refers to the answer of Clay in the Bourbon circuit court, as part of this answer; and this defendant insists that Clay was an innocent purchaser for a valuable consideration, without notice, till his purchase was complete."
The answer of Clay in the Bourbon circuit court, and which is referred to by Chiles, and made a part of his answer, is as follows: "This respondent further saith, that it is not true, that to increase the difficulties of the complainant, (Chiles,) as charged in said bill, John Newland and wife conveyed their interest to the lands in controversy to this defendant, &c.; but, on the contrary, this respondent avers that the contract he made with John Newland and Celia his wife, was a bona fide contract, in good faith, for a valuable consideration paid them, without notice, *or even a knowledge that the [*241 complainant, Chiles, had, or any of the other complainants, any claim on said land; but, on the contrary, this defendant has been informed, and believes, verily, that the claim of the complainant Chiles, is founded in fraud and imposition," &c.; and "as to the contract between this respondent and John Newland and wife, it is committed to record and will speak for itself; and this respondent believes the complainant Chiles has misrepresented the true meaning thereof."
Although the averments in the bill, filed by Chiles on this point, *180 in the Bourbon circuit court, and the answer of Newland and wife, in the present case, have no connexion with the answer of Chiles under consideration; yet I will refer to them, as they have been thought to have some influence in the case. In his original bill filed against Clay and others, in the Bourbon circuit court, Chiles alleges, that, "to increase the difficulty, the said John Newland, and Celia, his wife, have conveyed their interest in said tract, with others, to a certain Green Clay, who, your orators charge, had full knowledge of your orators' claim; and, as they are informed and believe, executed a contract with said Newland and wife when he received their conveyance, binding himself to make good all the contracts of their ancestor; but yet the said Green Clay refuses to convey to your orator, William Chiles."
And Newland and wife answer to the bill in the present case, "that Celia is a daughter of Hoy, and that if ever they had an interest in the land mentioned in the said bills, and now in contest herein, that they have long since transferred their interest therein by a writing amounting to a quit-claim, to Green Clay; but they never conveyed the title, by deed, to him or any one else."
The answer of Newland and wife cannot be read in evidence against Chiles, a co-defendant. If this answer, in every respect, were in accordance with the most technical forms, it could not aid a defective averment in the answer of Chiles; nor can its defects, in any respect, have an unfavourable bearing on that answer. It must rest upon its *242] own language, equally unaffected *by the answer of Newland and wife, and the original bill filed by Chiles in the Bourbon circuit court.
As it regards the sufficiency of the answer of Chiles to protect himself under the title of Clay, who is alleged to be an innocent purchaser for a valuable consideration, and without notice, it may be remarked, that no exceptions were taken to the answer; but a general replication was filed, or considered as filed.
In the case of Harris v. Ingleden, 3 Pier Williams, 95, it is said that "notice and fraud must also be denied generally, by way of averment in the plea, otherwise the fact of notice or of fraud will not be in issue. That, where a defendant, in his plea of a purchase for a valuable consideration, omits to deny notice, if the plaintiff replies to it, all the defendant has to do is to prove his purchase; and it is not material if the plaintiff proves notice, for it was the plaintiff's own fault that he did not set down the plea to be argued, in which case it would have been overruled."
But, independent of this consideration, what will constitute a good plea, by Chiles, to protect this purchase under Clay?
It must appear that the persons who made the conveyance to Green Clay were seised of the land; that they conveyed by deed to him, and for a valuable consideration, which was paid, and the deed executed, before notice of the complainant's equity. Mit. Pleadings, 275; Hinde, 180; 3 P. Williams, 281; 1 Vern. 179.
Are not these facts found substantially in the answer of Chiles? It *181 sufficiently appears that Newland and wife were seised; for they are stated to be the heirs of Hoy, in part, to whom the land descended, or was devised. And Chiles avers that "Clay was an innocent purchaser, for a valuable consideration, without notice, until his purchase was complete." His purchase could not be complete in the sense here expressed, until the consideration was paid, and the deed executed. If this be the clear meaning of the allegation, it must be held sufficient. But the averments in the answer of Green Clay, are made a part of the answer of Chiles.
It must be admitted that this answer of Clay is loosely drawn, and without much regard to the forms of pleading. But, although *Clay speaks of his contract with Newland and wife, it is clear [*243 that he refers to a deed of conveyance, as he states it has been recorded; and to use his language, it will speak for itself. And he avers that his purchase from Newland and wife was bona fide for a valuable consideration, and without notice.
Now when these allegations are incorporated with those contained in the answer of Chiles; and the fact, that there was no exception to the answer, are considered; I am inclined to think that the allegations should be considered sufficient to protect the title asserted. The amount of the consideration paid is not specifically stated, but the averment is general: that a valuable consideration was paid, and that before notice.
It must be admitted that the allegations in the answer of Chiles, in relation to this purchase, are not made with technical precision; and if exceptions had been taken to this part of the answer, they might have been sustained. But the complainants having failed to except, ought not now to insist, and indeed cannot, on the same degree of strictness as to form, as if they had done so. If this were admitted, the defendant would be taken by surprise, and the ends of justice might be defeated. To guard against this, the forms of pleading require exceptions to be taken to matters set up in the defendant's answer in bar of the plaintiffs' right. If exceptions be waived, and an issue taken on the answer, the complainants cannot object to the matter in bar on the ground of the insufficiency of the plea or answer. If Clay was a purchaser without notice, Chiles may shelter himself under a deed from Clay. The estate having been innocently and fairly acquired, and for a valuable consideration, can be conveyed to a person with notice. 1 Atk. 571; 2 Atk. 139, 242; 2 Eq. Cas. 685; 13 Ves. 120; Pre. in Cha. 51. That a decree was loosely entered against Clay in the Bourbon court is of no importance, as that decree has been annulled. If the objection as to the sufficiency of the answer of Chiles, under the circumstances, cannot now be insisted on by the complainants; it becomes important to examine the deed from Newland and wife to Green Clay, and to determine the effect of that conveyance.
I will transcribe the operative words of the deed. "This *indenture, made this 23d day of May, in the year 1814, between [*244 John Newland and Celia his wife, of the county of *182 Madison, and state of Kentucky, of the one part; and Green Clay, of the same county and state aforesaid, of the other part, witnesseth: that the said John Newland and Celia his wife, for and in consideration of the sum of one hundred dollars, to them in hand paid, the receipt whereof, &c.; have granted, bargained, and sold; and do, by these presents, grant, bargain and sell, and convey to the said Green Clay, his heirs and assigns for ever, all the right, title, claim and interest which they, the said John Newland and Celia his wife have in and to the real and personal estate of William Hoy, deceased; and all debts, dues, and demands, rents and profits, either in law or equity, to which they are or shall be entitled, as one of the heirs and legatees of the said William Hoy deceased; she, the said Celia Newland, wife of the said John Newland, late Celia Hoy, being one of the children and legatees of the said William Hoy, deceased." To this, covenants of special warranty are added, and also of further assurances, &c.
Can any doubt exist that this deed conveys to Green Clay what it purported to convey to him, all the right and title, &c., of the grantors to the real estate of William Hoy, deceased. Celia Newland, under the will of her father, received a certain interest in her father's real estate, and this interest she conveyed by the above deed.
It is true that Newland and wife, under the will of William Hoy, could receive nothing more than the legal title, their ancestor having, in his lifetime, sold or conveyed the equitable title. But, having the legal estate, does any one doubt that they could convey, and did convey to Green Clay, a clear title to the land, if he was a bona fide purchaser, without notice, and for a valuable consideration.
That Clay was a purchaser of this description is averred, and there are no facts in the case which disprove the averment; and, in all such cases, the proof of notice or fraud rests with him at whose instance the title is impeached.
The deed of Newland and wife describes with sufficient certainty *245] the interest conveyed. It was the interest which Celia *Newland received under the will of her father. This conveyance, containing all the operative words necessary to convey an estate in fee, and also describing with the requisite certainty the interest conveyed, must be considered as an operative and valid conveyance in the hands of Clay; who, as before stated, was a purchaser without notice, and for a valuable consideration. I think, therefore, that Chiles, without reference to his knowledge of the facts or his conduct, should be considered as holding this interest against the equity asserted by the complainants.
The counsel for the complainants insisted, that, under the decree of the Bourbon circuit court, Chiles was invested with the legal estate in the land; and that the legal title, under the deed of the commissioner, still remains in him, notwithstanding the reversal of the decree by the court of appeals.
The decree of reversal, by the court of appeals, does not require this deed to be cancelled; nor, in my opinion, was it necessary to *183 annul it. The deed of the commissioner is inseparably connected with the decree; indeed, it is a part of the decree; and must have the same effect as if the statute of the state had provided that a decree should operate as a conveyance.
In this respect the deed is different from a deed executed by a sheriff on a sale on execution, or perhaps a sale under a decree in chancery. A reversal of the judgment does not invalidate the sheriff's deed; but a reversal of the decree must destroy the effect of the commissioner's deed; as in no sense can he be considered as the agent of the party, but as an officer of the court, and as acting strictly under its authority. He does not, as a purchaser under an execution, pay money on the faith of the sale. The title passes by this deed; but if the decree, which is the authority of the commissioner, be reversed, the deed must fall with it.
That this is the view taken of the commissioner's deed in Kentucky, is shown by the proceedings in all cases of reversal. The decree of Chiles was reversed, and the case was sent down to the Bourbon chancery court, with instructions to amend the bill, and to have further proceedings. And I presume the cause *is still pending in [*246 that court, and Chiles is praying for a title for the lands embraced by the commissioner's deed.
In the case of Watts et al. v. Waddle et al. 6 Peters, 400, the court says "the deed executed by the commissioner in this case, must be considered as forming a part of the proceedings in the court of chancery; and no greater effect can be given to it, than if the decree itself, by statute, was made to operate as a conveyance in Kentucky, as it does in Ohio."
The right set up by the present occupants of the land, against that which is asserted by the complainants, is the next point for consideration. I shall examine this point with some minuteness, as I cannot assent to the decision made by my brother judges.
Smeltzer, it is proved, took possession of the four hundred acres he purchased from South in 1791; and he, or those claiming under him, have been in the possession ever since. And it is proved that Smith took possession of his purchase of two hundred acres in 1798, and the additional purchase of fifty acres shortly afterwards; and he, or those claiming under him, have held possession to this time. The first question that arises in this, and all similar inquiries is, whether the possession of the occupants was adverse to the title asserted by the complainants.
If the title of the tenants was not adverse, the statute of limitations cannot operate; nor can we, by analogy, apply the principles of the statute in the case.
The title set up by these defendants is under South, who claimed under an assignment of Searcy's bond by George Boone, as the attorney of Thomas Boone, the ancestor of the complainants. This assignment by George Boone was not authorized by the power of attorney under which he acted. That power authorized George Boone "to ask, demand, sue for, and recover, of and from William Hoy, a deed *184 or other lawful conveyance, valid in law," for the land; but he had no power to sell or convey the title. This act was void, as to Thomas Boone. In no respect could it prejudice his right; for South taking the assignment, was bound to look to the authority under which it was made.
In the case of Hawkins, Witton et al. v. Page's heirs, 4 Bibb *247] *138, the court of appeals say, "the only plausible objection that can be raised to these conclusions is, that the possession of twenty years, and upwards, would give a legal estate to the possessor under the equity, notwithstanding the legal title remained in another. This doctrine cannot be maintained. So long as the holder of the equity looked to the legal title-holder for the legal estate, he must be considered as holding under him; and the length of possession enures to the benefit of the legal estate, as against adverse claimants, but did not give the legal estate to the equitable possessor; as between these two, the legal title-holder and the equitable possessor, and by continuing under these circumstances, lapse of time could be no bar, and could not transfer the right of entry to the possessor." And in the case of Gay v. Maffitt, 2 Bibb, 507, the court say, "where one claims under or through the other, there shall be no adverse possession in such case, sufficient to give a title." And again, in the same case, page 508, "if, therefore, we consider the appellant as having no other title than that derived from possession, and that his possession has been changed from an adverse, hostile, into a friendly, possession, it follows, that the statute of limitation does not apply to his case." And in 5 Littell, 318, it is laid down, that "a holding of land under a bond from the patentee, cannot be considered as adverse thereto." Other decisions in Kentucky, to the same import, might be cited, but it is unnecessary. That the rule established in Kentucky must govern the question under consideration, is admitted; although such rule be different from the general law on the subject.
It is, then, well settled in Kentucky, that a purchaser who enters under a contract, looking to the person in whom the fee is vested for the perfection of his title, does not hold adversely to the legal title.
The legal title to the land in controversy was in the heirs of Hoy; of course the possession or title of the tenants could not be adverse to them. And is it not equally clear that, as the tenants set up a title under an assignment of Thomas Boone, and claim through him, their title is not adverse to his; and consequently, their possession is not *248] adverse. Their title, as asserted, *can be of no validity unless the equity of Thomas Boone, from Hoy, shall be established. They claim under and through Thomas Boone, and not in hostility to him. Their possession, therefore, so far as it rests upon a claim of title, is in no sense hostile to the legal interest of Hoy's heirs, nor the equitable interests of Thomas Boone.
Under such circumstances, no length of time would enable the tenants, as against Hoy's heirs, to set up the statute of limitation. So fully is this rule established in Kentucky, that when Chiles prosecuted *185 an action of ejectment in the name of Hoy's heirs, in the Bourbon circuit court, against the tenants, they did not rely on the statute.
I do not insist that the parties in this case are so situated that lapse of time can have no effect upon their rights; but it is clear that, on the part of the tenants, the statute of limitations cannot be set up as a bar in an action at law; and by consequence, it cannot be applied, by analogy, as a bar in equity. The rule of the statute, in chancery, is adopted on the ground that equity follows the law; and where the law fails, the rule in equity must also fail.
A court of chancery is said to act on its own rules, in regard to stale demands, and independent of the statute. It will refuse to give relief where a party has long slept upon his rights; and where the possession of the property claimed has been held in good faith, without disturbance, and has greatly increased in value. But in such a case, the court will give due weight to all the circumstances connected with the claim of title or possession, and the effect of the lapse of time may be obviated by a great variety of facts and circumstances; which, however, would be unavailable to the complainants where the statute would bar.
I will now examine the equity of the tenants in regard to the lapse of time.
It will be observed that they set up a purchase under John South, the executor of William Hoy, in 1791, when South had no pretence or colour of title to the land, except as having married one of the legatees of Hoy; and through her he could claim *only a naked [*249 legal title, the equity having been transferred by Hoy in his lifetime.
And afterwards, in 1792, when South obtained the assignment of Searcy's bond, by George Boone, as the attorney of Thomas Boone, the assignment was inoperative for want of power in the attorney. This assignment, upon its face, would direct every person who claimed any interest under it, to the authority by which George Boone acted.
Had Smeltzer and Smith, the first purchasers, notice of this defect in the assignment to South?
In his deposition, Nicholas Smith says, "that he bought a bond of John South, in 1798, for two hundred acres of land, out of the tract in controversy; and that, shortly after, he purchased from South the residue of the tract, supposed to be sixty or seventy acres, after satisfying Smeltzer's purchase of four hundred acres. And, at the same time, he lent South three hundred dollars, which sum was to go as payment for the land; and if that sum overrun, he was to pay back, and if it fell short, the witness was to pay the balance. He took possession of the land, and has ever since held it, under this purchase; but he afterwards found out that South had no right to sell the land, and brought suit against him, and recovered back the three hundred dollars."
The time that Smith ascertained that South had no right to sell the land does not appear; but the facts stated authorize the inference *186 that this knowledge was acquired by Smith not long subsequent to the purchase. Some time before 1809, it appears South was very much embarrassed, and in that year was confined as a lunatic. The suit of Smith must have been brought before South's extreme embarrassment, as the money was recovered from him, and in all probability the money was repaid to Smith within five or, at most, six years of his purchase.
Barbara Smeltzer, the wife of Peter Smeltzer, who purchased the four hundred acre tract, states in her deposition, that her husband made the purchase of South, &c., who claimed the same under the bond from Reuben Searcy to William Hoy, and assigned by Hoy to George Boone; that, at the time they first settled, John South represented *250] to her husband that he had traded *for the said bond, but that they afterwards found out he had not got the bond, but soon afterwards he obtained it from George Boone.
John Walton, a witness, states that he acted as one of the commissioners to divide the land, agreeably to the will of Peter Smeltzer, deceased, about the year 1805 or 1806; and that there was conversation at that time, among the heirs of Smeltzer, about South and Hoy's bond," &c.
Joseph Steele, a witness, states that he was informed by George Boone, that Smeltzer had notice, before he purchased the land from South, that it belonged to Thomas Boone. This statement seems not to have been objected to in the circuit court.
James Robinson, a witness, being present when the deposition of Barbara Smeltzer was taken, was astonished to find that a person of her age should describe so accurately Searcy's bond to Hoy, as to its date, the land called for, &c.
Benjamin Mills, an attorney at law, who was sworn as a witness, states, in 1826, that many years before, Peter Smith, and either John or Jacob Smeltzer, and perhaps Nicholas Smith, applied to him to bring suit for the legal title of the land, and especially for that part described in the bond signed by South, Carr, and Glover; but on examining the title, although the witness declines making some statements on account of professional confidence, yet he says, substantially, he considered the title wholly defective under the assignment of South; and, for that reason, declined bringing the suit. As the witness left the bar for the bench, in 1818, and as he speaks of the bond of South, Carr, and Glover, which was given up, in 1817, to Chiles, this conversation must have been prior to that time, and probably, was several years before it.
But in 1817, Smith, and the heirs of Smeltzer, surrendered to Chiles the bonds they held on South for the land, and bought the land of Chiles, agreeing to pay him for it ten dollars per acre.
Chiles having possession of the bonds of South, who was then deceased, rescinded the contract with his executor, gave up *251] *South's bonds for the land, and received from the executor Searcy's bond, after the erasure of the assignment by George Boone, as the attorney of Thomas, to South.
*187 Judge Mills, while at the bar, brought an action of ejectment in the name of Hoy's heirs, to recover possession of this land; but it was dismissed for want of prosecution. Afterwards, in the year 1817, he brought a second ejectment, which was served on the tenants; against whom a final judgment was obtained by the verdict of a jury, defence being made in 1818.
To open a judgment by default in this cause, Nicholas Smith and Jacob Smeltzer swore, that "they had no expectation that William Chiles would have prosecuted the suit to judgment against them, as they had purchased from him the title of Hoy's heirs for the sum of six thousand dollars, nine hundred dollars of which sum they had paid to him, and that the balance was not then due. They stated they held Chiles' bond to convey to them Hoy's title, and that when the compromise was made, the suit was not to be prosecuted, &c.
In 1820 or 1821, George W. Baylor purchased the interest of Peter Smeltzer's devisees in the tract of land in controversy; and on the 25th of August, 1821, received a conveyance for one third of the tract from Anna Maria Smeltzer and her husband. The consideration named in the deed is nine hundred dollars, and the grantors only convey their right, title, and interest, and warrant against themselves and all persons claiming under them. And for the residue of the tract, Baylor holds the bonds of John and Jacob Smeltzer; but what consideration was paid or contracted to be paid does not appear. George W. Baylor having died shortly after the commencement of this suit, it has been carried on against his heirs who are made parties. The heirs of Cummings, who are defendants, seem not to be entitled to any part of this land. It then appears that the heirs and assignees of Nicholas Smith, and the heirs of Baylor, are the tenants, and the only persons who rely upon the lapse of time and the length of possession to protect them in this case.
James Hutchins, a witness, swears that George W. Baylor took possession of the land in dispute some time in April, 1823. *That [*252 he does not remember whether he heard Baylor say any thing, particularly about Boone's claim, before he moved to the land. But, the witness states, after Boon Engles' return from Pennsylvania, in 1822, he heard him tell Baylor that he was authorized to investigate Boone's claim, and that he would have the land.
And William Burr, a witness, says: "before Engles went to Pennsylvania, he heard him and Baylor have some conversation about the claim of Thomas Boone to the land now in contest. The deponent has not a distinct recollection of what was said, but is under the impression Baylor spoke of an intention to purchase Smeltzer's land, and that Engles advised him not to do it, because the land belonged to Thomas Boone. He also thinks that Baylor and Engles had some conversation about forming a partnership in the investigation of Boone's claim." He says, after Engles' return from Pennsylvania, and before Baylor had removed to the land, Engles and he had different conversations respecting Boone's title."
These are the leading facts on which the heirs of Baylor and Smith *188 claim protection of a court of chancery from the lapse of time, and the equitable circumstances of the case.
In the first place, they claim under the same title as the complainants, and not in hostility to it.
South had no right under the assignment of George Boone; and there is no evidence that the purchase money was paid by Smeltzer or his heirs to South; and the amount paid by Nicholas Smith was sued for and recovered from South, after it was known that he had no title to the land. And this must have been within a very few years after the purchase of Smith, not exceeding ten years, and perhaps less than five.
That Smeltzer had notice of the want of title in South, is certain, from the depositions of his widow Barbara Smeltzer, and Joseph Steele. She states that, when South sold to them the land he had not the bond of Searcy, but that he afterwards obtained it. With accuracy she detailed the substance of the bond, its date, and the assignments. Smeltzer, therefore, as she states, was well acquainted *253] with the fraud of South, in selling the land *before he had a title, and this should have put Smeltzer on his guard. He was, no doubt, as well acquainted with Searcy's bond as his wife, and the assignment of George Boone was evidence upon its face, that unless he acted under a power from Thomas Boone the assignment was void.
An action of ejectment was commenced, in the name of Hoy's heirs, to recover possession of the land, which was afterwards discontinued. And afterwards, in 1817, when Chiles, under his purchase of Hezekiah Boone, and having the sanction of George Boone, the attorney of Thomas Boone, to investigate the title, the tenants surrendered the bonds they had on South, although security was given in the one held by Smeltzer's heirs to Chiles, who cancelled the contract with South, and sold the land to the tenants. It is true, this contract of Chiles is represented to have been obtained by fraud; but the payment made under it, and the use made of it to set aside a judgment by default in the ejectment suit, show that they had wholly abandoned the claim of title under South.
And, as it regards Baylor's heirs, they were in possession only one or two years before the commencement of this suit; and their ancestor purchased nothing more than the right of Anna Maria Smeltzer, one of the legatees of Peter Smeltzer, with only a special warranty, and of John and Jacob Smeltzer, the other legatees of the land in dispute; and the inference is authorized, that the same interest, and no more, was to be conveyed under the title bonds, and this with a full knowledge of the complainant's equity, and of the total defect of title in the legatees. Can a right thus acquired and asserted be protected by lapse of time? Does it come within that salutary rule, which has been adopted to preserve the peace of society, and protect rights long acquired and enjoyed without interruption, against stale demands? Did not Baylor purchase the interests of Smeltzer's legatees on speculation? Knowing the title of the legatees to be defective, or rather to *189 have no foundation on which it could be sustained, did he not purchase it; and, under such circumstances, how can the lapse of time aid him? If this principle might have been invoked by Smeltzer's legatees, is the same right transferred to Baylor, who *purchases [*254 the interest of the legatees, without a general warranty, and for a valuable consideration? This appears to me to have been a purchase that does not draw after it the equitable considerations which were connected with the title of Smeltzer's legatees; and if it did, I am not prepared, under the circumstances, to say that it is entitled to the protection of a court of chancery.
It appears to me that the purchase was made with more reference to the value of the improvements than the title of the tenants; and under the expectation that, if the land should be lost, compensation for the improvements would reimburse the purchase money.
And as it regards the title of those who claim under Nicholas Smith, it seems not to require a much more favourable consideration. The money proved to have been paid by Smith, on the purchase from South, was recovered back again; and the heirs abandoned the claim under South, and purchased from Chiles. He purchased fifty acres of Jones, which is covered by Flournoy's patent; and he is protected, under the statute of limitations, to this extent.
I have looked through the cases decided in this country and in England, and I can find no instance where lapse of time, under circumstances analogous to those which belong to this case, has been held sufficient to protect the possession against a clear equitable title.
The presumptions in favour of the tenants, which might arise from lapse of time, are repelled by the facts and circumstances of the case. These must always be regarded as controlling mere lapse of time; and they are such, in this case, as to convince me that to protect the rights set up by the tenants would sanction a new rule, and one that would be dangerous to bona fide claimants. I am, therefore, of the opinion that time, which cures many imperfections in a meritorious title, and often authorizes the presumption of title where none, in fact, exists, cannot protect the tenants in this case.
That the complainants should be decreed to release their interest to the tenants, under the contract they made with Chiles, is, to me, a most extraordinary result of the controversy. I *cannot give [*255 my sanction to the principles on which it rests. If the decree enforces this contract, then must lapse of time be abandoned; for the contract bears date only five or six years before this suit was instituted: and on what principles such a decree can be made, in the relation which the parties bear to each other in the suit, and in the present state of the pleadings, I am unable to comprehend.
This contract is declared by the tenants to be fraudulent; and they have refused, by their whole proceedings in this suit, to be bound by it. They have invoked the aid of a court of chancery to annul and set aside this contract; and, I believe, have taken steps to recover back from Chiles the money they had paid him on it.
But this contract is not only declared by the tenants to be fraudulent *190 and void: the complainants also denounce it as fraudulent. It finds favour in the eyes of no one but Chiles. And yet, this contract, thus treated by the complainants and defendants, and made by Chiles without a colour of right, is made the basis of a decree of this court, which takes from the complainants, and gives to the defendants, a large estate. Chiles, through the fraudulent instrument in making this contract, is not permitted to enjoy any advantages under it.
If the complainants had adopted this contract; if they, in any manner, had sanctioned the contract, by treating Chiles as their agent in selling the land, there would be some ground to decree a specific execution of it. But the complainants have not sanctioned the conduct of Chiles in making this contract; and so far from seeking any thing under it, have declared it to be fraudulent and void: and yet, in despite of them, it is made the rule by which their rights are decided. I am altogether opposed to the decree on this ground.
As the decree of the circuit court is reversed, it cannot be necessary to say any thing respecting the decree which was made respecting the rents and profits. It will be found, however, that Hoy had eight heirs; two of whom, Fanny Hoy and Jones Hoy, were defendants in the suit; and that Chiles had received conveyances from two of *256] the heirs, besides Newland and *wife. And as Chiles was decreed to convey his interest, and the two heirs of Hoy, who were defendants, were decreed to convey, also, under this decree; the complainants became vested with four-eighths of the land, and he was made accountable to pay for that proportion of the improvements, and in the same proportion was held entitled to the rents.
Elizabeth South, whose deed is in the record, is not a party to the suit, and the court could not act on her interest.